LINDSAY INSURANCE AGENCY, APPELLANT, V. RALPH MEAD,
APPELLEE.

508 N.W.2d 820

Filed December 3, 1993.    No. S-92-029.

Ross A. Stoffer, of Mueting and Stoffer, for appellant.

Mark D. Albin, of Albin Law Office, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ.

BOSLAUGH, J.

Plaintiff-appellant, Lindsay Insurance Agency (Lindsay), brought this action to recover $9,209.28 in insurance premiums and accrued interest from defendant-appellee, Ralph Mead. The county court ruled in favor of Mead and dismissed Lindsay's petition; the district court affirmed the judgment. The Nebraska Court of Appeals dismissed the appeal to that court; this court then granted Lindsay's petition for further review.

In dismissing Lindsay's appeal to the Court of Appeals, that court listed Lindsay's eight assignments of error, then stated:

> In reviewing decisions of the district court which affirm, reverse, or modify decisions of the county court, an appellate court will consider only those errors specifically assigned in the appeal to the district court and again assigned as error in the appeal to the appellate court. *State v. Erlewine*, 234 Neb. 855, 452 N.W.2d 764 (1990). This rule of practice was adopted by the Supreme Court, see Neb. Ct. R. of Cty. Cts. 52(I)(G) (rev. 1992), and became effective so as to apply to all county court decisions appealed to the district court after March 23, 1990. The case herein was appealed to the district court in June 1991. . . .
>
> While the district court's order indicates that Lindsay assigned eight errors, the specific errors are not in the

record before this court. Therefore, we must dismiss this appeal.

*Lindsay Ins. Agency v. Mead*, 1 NCA 2276, 2277-78 (1992). In its sole assignment of error in its petition for further review to this court, Lindsay asserts that the Court of Appeals erred in dismissing the appeal on the ground that the errors assigned in the appeal to the district court were not in the record before the Court of Appeals.

The record on which the Court of Appeals based its dismissal of the case shows that on October 23, 1991, the county court ruled in favor of Mead and dismissed Lindsay's petition. The district court affirmed the judgment on December 13, 1991, and Lindsay filed a timely appeal. The district court's "Order Affirming Judgment of Dismissal" states in part: "Appellant's Statement of Errors consisting of 8 specific assignments of error can be reduced to one basic assignment of error, that is, that the trial court's findings were not supported by the evidence." Then, on February 3, 1992, Lindsay filed a "Statement of the Issues" in the district court. That document lists eight issues which correspond to errors assigned on appeal to the Court of Appeals.

The rule cited by the Court of Appeals in dismissing Lindsay's appeal, Neb. Ct. R. of Cty. Cts. 52(I)(G) (rev. 1992), stated in part:

Within 10 days of filing a notice of appeal, the appellant shall file with the district court a statement of errors, which shall consist of a separate, concise statement of each error a party contends was made by the trial court. Each assignment of error shall be separately numbered and paragraphed. Consideration of the case will be limited to errors assigned and discussed. The district court may, at its option, notice a plain error not assigned.

In addition, *State v. Erlewine*, 234 Neb. 855, 857, 452 N.W.2d 764, 767 (1990), cited by the Court of Appeals, states in part:

The Supreme Court, in reviewing decisions of the district court which affirmed, reversed, or modified decisions of the county court, will consider only those errors specifically assigned in the appeal to the district

court and again assigned as error in the appeal to the Supreme Court. This rule shall be effective so as to apply to all county court decisions appealed to the district court after the filing date of this opinion [March 23, 1990].

After considering *Erlewine* and rule 52(I)(G) with reference to the circumstances of this case, the Court of Appeals apparently concluded that it had no jurisdiction over the case because the record failed to show that Lindsay timely filed the statement of errors within 10 days of filing a notice of appeal as required by rule 52(I)(G), and, in fact, Lindsay did not file such a statement of errors until after the district court affirmed the county court's decision. The Court of Appeals may have also concluded that because Lindsay filed the statement of errors after the district court decided the appeal, the record did not show that those eight errors which Lindsay listed were the same ones reviewed by the district court. In any event, we hold that Lindsay's appeal should not be dismissed.

Notwithstanding language contained within *State v. Hanger*, 241 Neb. 812, 491 N.W.2d 55 (1992), compliance with the requirements of rule 52(I)(G) is not a prerequisite to the district court's or an appellate court's jurisdiction over an appeal of a decision rendered by the county court. That rule is simply a procedural tool designed to frame the issues to be addressed in the appeal to the district court.

Furthermore, *Erlewine* does not limit appellate review to the issues set forth in the statement of errors which is filed by an appellant pursuant to rule 52(I)(G). Instead, *Erlewine* limits appellate review to those errors specifically assigned in the appeal to the district court and again assigned as error in an appeal to a higher appellate court. The district court may limit its consideration of assignments of error to those set forth in rule 52(I)(G). However, when no such statement is filed, an appellate court may at its discretion consider errors assigned in the appellate court, provided that the record shows that those errors were also assigned in the district court. An appellate court may also consider plain error not assigned. See, Neb. Rev. Stat. § 25-1919 (Cum. Supp. 1992); Neb. Ct. R. of Prac. 9D(1)d (rev. 1992); rule 52(I)(G). See, also, *Schmidt v. Richman Gordman, Inc.*, 191 Neb. 345, 215 N.W.2d 105

(1974).

In this instance, the record is sufficient to warrant consideration of Lindsay's consolidated assignment of error. The eight errors which Lindsay assigned in the Court of Appeals, when consolidated, assert that the county court's findings were not supported by the evidence. The district court's statement that Lindsay's eight specific assignments of error could be reduced to "one basic assignment of error, that is, that the trial court's findings were not supported by the evidence," was sufficient to permit consideration of that consolidated assignment of error in the appeal of the district court's affirmance of the decision of the county court. We now address plain error appearing in the record, keeping in mind the appropriate standard of review.

In reviewing a judgment in a bench trial of a law action, an appellate court does not reweigh the evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Properties Inv. Group v. Applied Communications*, 242 Neb. 464, 495 N.W.2d 483 (1993); *Dowd v. First Omaha Sec. Corp.*, 242 Neb. 347, 495 N.W.2d 36 (1993).

Viewing the evidence in a light most favorable to the appellee, Mead, we find the record shows the following: Prior to 1988, Mead had purchased insurance coverage through Elden Anderson, who was the manager of Lindsay. Anderson described his business relationship with Mead as "quite informal" and testified that "when [Mead] needed coverage . . . I would go to his place of business and I would discuss his needs and at that point in time I would . . . ask the company to insure a specific item."

While Mead would orally request coverage and Anderson would orally bind coverage with an insurer which Lindsay represented, apparently Lindsay did not send Mead written binders to document the fact that he was insured. Instead, Lindsay simply sent the insurance policy to Mead after the insurer issued the policy. In addition, Lindsay normally paid the premiums on the policies that had been issued, then, in turn, billed Mead for the amount of the premiums.

The policies which Mead had purchased afforded him coverage for property damage, general liability, and workers' compensation claims in connection with his business properties. Those properties included a convenience store in Pierce, Nebraska, and a restaurant and lounge in Newman Grove, Nebraska. On April 28, 1988, Mead requested $5,000 of additional coverage on the contents of a newly constructed convenience store near Burwell, Nebraska. Lindsay, through the insurer, Cornhusker Casualty Company, added such coverage at the Burwell location to the single property and liability policy which covered Mead's properties in Pierce and Newman Grove. While Mead raises a question concerning the parties insured under the policy, the record shows that Mead was a named insured under the policy and that he did have an insurable interest in each of the properties.

On May 28, 1988, property and liability coverage was added to the Burwell property, and coverage on the contents of the Burwell property was increased to $40,000. While Lindsay contends that Mead requested such coverage, Mead asserts that he only requested a quotation of the cost of such coverage. On June 15, 1988, the policy covering Mead's three business properties expired, and at some point in time, the insurer issued a 1-year renewal policy covering the three business properties. However, Lindsay did not deliver the renewal policy or bill Mead for the coverage until September 1989, more than 14 months after the effective date of the renewal policy and more than 2 months after the expiration of that policy. Mead made payments for such coverage, and testified that he thought he had paid the entire cost of coverage on his Pierce and Newman Grove properties. However, Mead testified at trial and argues in this appeal that he did not request coverage on the Burwell property and that he therefore does not owe any premiums for such coverage.

Although Mead argues that he merely requested a quotation of the cost of coverage on the Burwell property, the record shows that in July 1988, Mead telephoned Lindsay to report that an individual had fallen at his Burwell convenience store. During that telephone conversation, Mead discussed insurance coverage on the Burwell property with Anderson. Regarding

that conversation, Mead provided the following testimony:

Q. What was your understanding after talking to Elden Anderson about insurance coverage?

A. My understanding . . . from Elden was the fact that if anything happens you'll be covered and I assumed it was a binder but no one said that. . . .

Q. Do you recall specifically what . . . Anderson said to you?

A. I — you know the exact words I'm not positive of but I think he assured me that I didn't have any worries because he would cover me.

Q. So after your conversation with Elden Anderson in July of 1988 did you think that you had insurance coverage in force and effect?

A. No, sir.

Q. Why is that?

A. Because I asked Elden the same day . . . if he had any idea what insurance would cost and he said no that some rating hadn't came [sic] down yet.

Mead also testified that he contacted Anderson the following month to ask what insurance would cost on the Burwell property. According to Mead, Anderson "still didn't give [him] an answer." Apparently Anderson never did inform Mead of the cost of coverage on the Burwell property until after the June 15, 1988, renewal policy had expired, as Mead testified that he did not know that insurance had been in force on the Burwell property until September 1989, when he was billed for such coverage. Mead then told Anderson that he would not accept such coverage. According to Mead, Anderson nevertheless offered to bind coverage on the Burwell property at that time. Mead then asked Anderson what such a binder would cost, and Anderson replied that he did not know but would "get back to" Mead regarding the cost of the binder. Mead was later billed $1,885 for the cost of a binder for the period from June 15 through December 12, 1989. A written binder was issued regarding this coverage; however, the issue date shown on the binder is January 3, 1990, more than 3 weeks after the binder coverage expired.

In addition to the foregoing, other evidence shows that Mead

apparently believed that he had no coverage, in that Mead's Burwell property suffered storm damage in June 1988, but Mead submitted no insurance claim for such damage. When asked why he had submitted no claim, Mead testified: "Because I didn't have any insurance."

After hearing such evidence, the county court found that Mead had not entered into an oral contract for insurance and dismissed Lindsay's petition. This finding is, in part, supported by the evidence. However, Mead's actions in reporting to Lindsay that someone had fallen at the Burwell convenience store and Mead's acquiescence after being told that he was insured require a finding that Mead did enter into a temporary contract of insurance. Consequently, we find plain error in the district court's affirmance of the county court's decision to dismiss Lindsay's petition.

To create a contract, there must be both an offer and an acceptance; there must also be a meeting of the minds or a binding mutual understanding between the parties to the contract. *Overmier v. Parks*, 242 Neb. 458, 495 N.W.2d 620 (1993).

> A binding mutual understanding or meeting of the minds sufficient to establish a contract requires no precise formality or express utterance from the parties themselves as to all of the details of the proposed agreement; it may be implied from conduct and the surrounding circumstances. . . . Likewise, the acceptance of an offer may be shown by words, conduct, or acquiescence indicating agreement.

*Atokad Ag. & Racing v. Governors of Knts. of Ak-Sar-Ben*, 237 Neb. 317, 322, 466 N.W.2d 73, 78 (1991), *overruled on other grounds, Eccleston v. Chait*, 241 Neb. 961, 492 N.W.2d 860 (1992).

> [A]n agreement exists between the parties when a reasonable man would believe that there was an agreement. . . . In determining whether an oral contract of insurance was made by an agent of the insurance company, the trial court may construe conversations between the agent and the insured in connection with the surrounding circumstances and previous dealings.

2 George J. Couch, Cyclopedia of Insurance Law § 14:14 at 25

(rev. 2d ed. 1984).

Furthermore, a temporary contract of insurance may be in writing or may be oral, or partly in writing and partly oral. *Rankin v. Northern Assurance Co.*, 98 Neb. 172, 152 N.W. 324 (1915). As stated in 2 Couch, *supra*, § 14:1 at 3-4:

> An insurer may make a temporary contract of insurance in the form of a provisional policy, a rider attached to a policy, or a binding slip or receipt. The latter is the most frequent form in which temporary insurance is expressed. Temporary insurance may be provided by oral or parol contracts entered into by an insurance company acting through an officer or authorized agent . . . .

We also note that a parol contract of insurance, in order to be valid, must be fairly entered into, for good consideration, by parties competent to contract, whose minds have met in a mutual agreement as to all of the essential elements of the contract, such as subject matter, the amount of the insurance, the risks insured against, the time the insurance goes into effect, and the amount of premium paid for a definite duration of time. *Whitehall v. Commonwealth Casualty Co.*, 125 Neb. 16, 248 N.W. 692 (1933). However,

> [i]t is not necessary that every term of the contract be expressed; some terms may be implied as from previous dealings between the parties and surrounding circumstances. . . . [W]here the terms are not expressly agreed upon, it will be presumed that the parties contemplated such terms, conditions, and limitations as are usual in policies issued to cover like risks, or in policies previously used by the parties. . . . [T]he failure to agree upon and state the rate of premium to govern an oral contract of fire insurance does not invalidate the contract, where the rates are standard in the community on the specific property covered, since the law will imply a promise to pay the standard rate.

2 Couch, *supra*, § 14:16 at 31-33.

Although it cannot be said that the record totally fails to support the county court's finding that Mead did not enter into a contract of insurance for the full period for which he was billed, the record nevertheless compels a finding that Mead

entered into a temporary contract of insurance. When Mead telephoned Lindsay in July 1988 to report that a person had fallen at his Burwell convenience store, Lindsay's manager, Anderson, informed Mead that he did have coverage. Mead acquiesced in the understanding that such coverage was in effect. According to Mead's own testimony, he assumed that a binder covered the Burwell property. While Black's Law Dictionary 169 (6th ed. 1990) defines a binder as a "written memorandum of the important terms of [a] contract of insurance which gives temporary protection to insured pending investigation of risk by insurance company or until a formal policy is issued," Mead's testimony that he "assumed it was a binder," in light of the parties' existing business relationship, requires a finding that Mead did enter into a temporary contract of insurance. Mead is therefore liable for temporary coverage on that property.

As stated in 2 Couch, *supra*, § 14:3 at 5:

> Generally a contract of temporary present insurance is terminated by the issuance, delivery, and acceptance of a policy, or by a rejection of the application, but if no policy is issued, delivered, and accepted, and the contract is not otherwise terminated, it continues until the time fixed thereby for its termination *or a reasonable time has expired*.

(Emphasis supplied.)

The determination of the period constituting a "reasonable time" in this instance is a question of fact for the trial court to determine upon remand. We note, however, that limitations on the duration of binders have been viewed as a protection for the benefit of those insured rather than as a means to void coverage being relied upon by the insurance consumer. See *Restaurant Enterprises, Inc. v. Sussex Mutual Ins. Co.*, 52 N.J. 73, 243 A.2d 808 (1968) (after being told by agent that he was insured, insured's coverage remained in effect despite the statutory 60-day limitation on the duration of a binder, since the purpose of such a statute was to protect the consumer).

While the record compels a finding that in July 1988, Mead had entered into a temporary contract of insurance which expired after a reasonable period of time, the record

nevertheless supports the county court's implicit finding that coverage did not exist for the full term for which Mead was billed with respect to the Burwell property. In reaching this conclusion, we note that an insured has a right to inspect a policy to see whether it conforms to the terms proposed in the preliminary negotiations. If the policy conforms to the application, the contract becomes complete on delivery, but, if not, then it constitutes a mere counterproposal. *Haas v. Mutual Life Ins. Co.*, 90 Neb. 808, 134 N.W. 937 (1912). The tender of a policy substantially different from that ordered will not, unless accepted by the assured, entitle the insurer to recover premiums for the policy. *Farmers Mutual Hail Ins. Ass'n v. Hainer*, 118 Neb. 116, 223 N.W. 655 (1929).

In this instance, Anderson delivered the policy, and the trial court found that Mead rejected the policy because of the high cost of coverage on the Burwell property. While the amount of the premium may be based upon standardized rates, an insurance consumer will not ordinarily be familiar with those rates. The premium payable for the coverage provided is an important term in the contract, and it is reasonable to expect disclosure of the premium within a reasonable time after the coverage is bound.

The issuance of an insurance policy is merely an offer and must be accepted to have contractual effect. *Dahlke v. Goebel*, 278 Minn. 318, 154 N.W.2d 401 (1967). See, also, *Chappelear v. Grange & Farmers Ins. Co.*, 190 Neb. 589, 210 N.W.2d 921 (1973) (an insurance policy is a contract which requires an offer and acceptance to be effective). Although a policy of insurance which included the Burwell property was issued in this instance, that policy was never accepted by Mead.

Lindsay points to Mead's conduct and his ongoing business relationship with Lindsay and argues that principles of equitable estoppel prevent Mead from avoiding liability for insurance coverage on the Burwell property. However, an estoppel cannot arise where the party claiming estoppel is equally negligent or at fault. *Scottsbluff Nat. Bank v. Blue J Feeds, Inc.*, 156 Neb. 65, 54 N.W.2d 392 (1952).

Here, it was largely Lindsay's own negligence in failing to deliver the policy which led to the dispute regarding coverage of

the Burwell property. As previously noted, the policy covering Mead's business properties for the period from June 15, 1988, through June 15, 1989, was not delivered until some time in September 1989, more than 2 months after the policy had expired. Anderson testified: "Somehow or other — I'm not sure I handled Mr. Mead's file myself, the policy ended up in the file and it was just never billed." If the policy had instead been billed and delivered within a reasonable time, then the disagreement and confusion regarding coverage of the Burwell property could have been resolved in a timely fashion, thereby preventing both the accrual of the disputed premiums and the resulting litigation. Consequently, Lindsay's own negligence precludes it from asserting that Mead is bound by principles of equitable estoppel in this instance.

In addition to the foregoing, we note that $1,885 of the total which Lindsay seeks to recover represents binder coverage on the Burwell property for the period from June 15 through December 12, 1989. The parties dispute whether such coverage was requested or merely discussed. Again, however, the evidence is sufficient to support a finding that Mead did not contract for that coverage.

Finally, we note that during the trial, Mead confessed that he had contracted for coverage of his Pierce and Newman Grove properties, and acknowledged that he is liable for any premium which may remain due with respect to those properties. However, we cannot determine from the record whether Mead continues to owe such premiums.

To summarize, then, we hold that in July 1988, Mead was bound by a temporary contract of insurance with respect to the Burwell property, but that the temporary contract expired after a reasonable period of time. We reverse the Court of Appeals' judgment and remand this action to that court with direction to remand the cause for determination of the reasonable duration of the temporary contract of insurance and the premium applicable thereto, and for a determination of the premiums remaining due, if any, with respect to the Pierce and Newman Grove properties.

REVERSED AND REMANDED WITH DIRECTION.