WINIFRED F. WELLS, APPELLANT, V. DOUGLAS L. WELLS, APPELLEE.

523 N.W.2d 711

Filed November 8, 1994. No. A-93-077.

Edward D. Hotz and Edith T. Peebles, of Zweiback, Hotz & Lamberty, P.C., for appellant.

Patrick A. Campagna and Steven J. Lustgarten, of Lustgarten & Roberts, P.C., for appellee.

CONNOLLY, IRWIN, and MILLER-LERMAN, Judges.

CONNOLLY, Judge.

In this divorce action, Winifred F. Wells appeals the decision of the Douglas County District Court which denied her request that she be reimbursed from her husband's future inheritance for investments that she made into the couple's failed business ventures with money from her own inherited funds. We affirm the decision of the district court, because (1) Winifred was unable to establish that the advances she made were loans, (2) Winifred was unable to prove the existence of a contract for repayment, and (3) Winifred failed to provide an equitable ground for establishing a constructive trust on her husband's inheritance.

## I. BACKGROUND

Winifred married Douglas L. Wells on June 27, 1970, in Omaha, Nebraska. A son was born to the marriage on July 10, 1972. In 1977, the couple formed a corporation called Wells & Son, Inc., in which Winifred, Douglas, and their son were the only shareholders. The corporation acquired the exclusive right to run the Godfather's Pizza franchise in the State of Arizona. Both Winifred and Douglas made significant financial contributions to the corporation, and they soon opened and operated 12 Godfather's Pizza establishments in Arizona. In the process of opening the pizza parlors, Wells & Son incurred a number of financial obligations, which Winifred and Douglas personally guaranteed.

The tax returns of Wells & Son are not in the record, but the witnesses' testimony conclusively showed that Wells & Son was a successful and profitable venture. Though Winifred claimed that she never received a check which specifically designated the funds as being derived from the profits of Wells & Son, the family did a lot of things that the corporation paid for, such as taking trips and eating out. Then, in 1987 or 1988, Winifred and Douglas sold 40 percent of their stock in Wells & Son to the Yanney Hughes Capital Group (Capital Group) for $1 million. The proceeds from the sale were reinvested into Wells & Son. Approximately 18 months later, Winifred and Douglas sold their remaining interest in Wells & Son to the Capital Group in exchange for a 40-percent share of the stock in a company called Western International Pizza Corporation, which was also held by the Capital Group. Subsequent to this sale, and now under the corporate name of Western International Pizza, the Wellses' Godfather's Pizza operation grew to a chain of 25 restaurants.

Wells & Son and Western International Pizza began to experience financial trouble when the Capital Group broke up. Wells & Son, the operating company for the Godfather's chain in Arizona, filed for bankruptcy. The remaining assets of Western International Pizza were either sold or foreclosed upon by creditors.

Sometime during 1986 or 1987, the Wellses took out a second mortgage on their home for $50,000. Winifred did not sign the

mortgage papers for the second mortgage. The money was used to finance Douglas' next two business ventures: FBN Investments, a partnership formed to purchase an airplane, and DW Dog, a hotdog franchise. Both FBN Investments and DW Dog failed. Douglas, who had been making the mortgage payments on the Wellses' first mortgage, was unable to pay the larger installments required by the second mortgage, so Winifred took over the mortgage payments. Winifred does not make any claim for money related to either FBN Investments or DW Dog.

The Wellses' next business venture returned the family to the pizza business. A new corporation was formed, called Spectrum Management, Inc. Originally, Winifred was the sole stockholder in the subchapter S corporation. Douglas could not own stock or act as a director of the corporation because he had signed a noncompetition agreement with Godfather's. Thus, with Winifred as a figurehead president and sole shareholder, Spectrum Management opened four Oregano's pizza parlors. Spectrum Management was capitalized with a $100,000 loan from Zion's Camel Bank in Arizona. Winifred testified that she had reluctantly signed as a guarantor on the loan.

Winifred and Douglas did not experience the success with Oregano's that they had with Godfather's. Spectrum Management quickly fell into debt, and Douglas was forced to turn to Winifred, among others, as a source of cash inflow to keep the doors of the Oregano's parlors open.

This leads us to the transactions which are the subject of this case. Winifred claims that she was steadfast in her reluctance to put any more of her own inheritance into Spectrum Management. She testified that she refused to provide Douglas with any more funds for Spectrum Management until Douglas promised to repay her from two trusts in which Douglas was a vested beneficiary. The trusts had been set up by Douglas' maternal grandparents and were to pay income to Douglas' parents during their lives, with three-quarters of the income payable to Douglas and his two siblings upon the death of his mother, and with the remainder of the principal to be distributed upon the death of his father. The trust assets exceed $2 million, but Douglas claimed to have had no knowledge of how much was

coming to him until after this divorce action was filed.

Winifred alleged that Douglas first promised to repay her out of his future inheritance in 1987 or 1988. Winifred further stated at trial that Douglas reaffirmed this promise almost every time he asked Winifred for money to be infused into Spectrum Management and that the parties frequently discussed the terms and value of the trusts. Douglas, on the other hand, stated that, other than maybe one time during a heated argument over finances, he never promised any of his future inheritance to Winifred. Douglas acknowledged that he and Winifred discussed the trusts, and he further admitted that repayment on some terms could have been discussed. However, Douglas denied ever having discussed repayment to Winifred out of his trust-fund money.

Both Winifred and Douglas agreed that Winifred contributed considerable amounts of her nonmarital holdings to Spectrum Management. However, Winifred did not offer any documentation of her contributions to Spectrum Management into evidence except for exhibit 18, the workpapers for Spectrum Management's notes payable account prepared by Audrey McGinnis, Spectrum Management's bookkeeper. Winifred testified that when Douglas would ask for money for Spectrum Management, the money would be drawn from her accounts with Paine Webber and E.F. Hutton, as well as from an annuity at First Capital. The money did not go directly to Douglas. Rather, the money was taken out in the form of a wire transfer or check toward payment of Spectrum Management's bills.

Due to the failure of the Oregano's chain, Spectrum Management eventually folded. Douglas sold the restaurants and equipment, but the creditors were not completely paid off. Winifred was the sole personal guarantor on several of the outstanding loans, and she was forced to settle several claims with the creditors.

The parties subsequently filed for divorce in Douglas County, and the trial court granted the divorce and calculated an equitable distribution of the marital property. The trial court denied Winifred's claim that she should be repaid the money invested in Spectrum Management from her own inheritance

out of Douglas' trust funds because Winifred failed to provide an equitable ground for recovery.

## II. ASSIGNMENT OF ERROR

The only error assigned by Winifred is that the district court erred in failing to include in the division of property to Winifred reimbursement from Douglas' inheritance for nonmarital inherited funds which Winifred invested in Spectrum Management.

## III. STANDARD OF REVIEW

 In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Reichert v. Reichert*, 246 Neb. 31, 516 N.W.2d 600 (1994). When the evidence in a dissolution case is in conflict, an appellate court may consider, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Baratta v. Baratta*, 245 Neb. 103, 511 N.W.2d 104 (1994).

## IV. ANALYSIS

Winifred argues three different theories as to why she should be entitled to reimbursement from Douglas' future inheritance. We will discuss each individually.

### 1. PRESUMPTION OF LOAN

Winifred's first argument is that in transactions where the wife advances money from her own separate, personal assets to a business that the husband manages, a loan from the wife to the husband is presumed. Winifred cites a number of cases from other jurisdictions as support for her argument. Though all of these cases support the notion that advances from a wife's separate funds to the husband should be presumed to be loans, each case is factually distinguishable from the case at bar, and thus each has limited persuasive authority.

For instance, in *Ustick v. Ustick*, 104 Idaho 215, 657 P.2d 1083 (Idaho App. 1983), the wife used over $53,000 of her own separate funds to pay the creditors of her husband's farm and to prevent foreclosure. The wife had apparently never participated in the farming operation and never derived any

direct economic benefit from the farm. The *Ustick* court held that when separate funds were used for the benefit of the community, such as payment of a debt arising from the acquisition of community property, the separate estate was entitled to reimbursement of the amount expended, unless there was clear and convincing evidence that a gift was intended.

Similarly, in *Sharpe v. Sharpe*, 202 So. 2d 822 (Fla. App. 1967), the wife advanced almost $7,000 of separate funds toward the purchase price of $15,543.38 for a grove that she and her husband purchased. The grove was subsequently sold for $45,000, from which the husband received half the proceeds and the wife received nothing. The *Sharpe* court held that the transaction should be construed as a loan from the wife to the husband or, alternatively, that the wife should have special equity in the money. Under either theory, the court held, the wife was entitled to reimbursement of her investment.

In another Florida case, *Allen v. Allen*, 123 So. 2d 355 (Fla. App. 1960), the wife advanced $25,000 to her husband to help him pay off various creditors and to purchase stock in the radio station where he worked. Given the confidential relationship between the parties, the *Allen* court presumed a loan from the wife to the husband and held that the wife was entitled to full reimbursement.

Winifred cites several other cases to support her argument that her advances to Spectrum Management should be presumed to be loans. See, e.g., *Estate of Abdale*, 28 Cal. 2d 587, 170 P.2d 918 (1946); *Van Inwegen v. Van Inwegen*, 4 N.J. 46, 71 A.2d 340 (1950); *Long v. Eddleman*, 22 N.C. App. 43, 205 S.E.2d 598 (1974), *cert. denied* 285 N.C. 660, 207 S.E.2d 755. However, *Ustick*, *Sharpe*, and *Allen* are the most factually similar to the case at bar, and each is distinguishable. The difference between the cases cited and Winifred's situation is that, in the cases cited, the wives' advancements were for the sole benefit of their husbands. In the instant case, the funds were advanced to a subchapter S corporation in which Winifred was the sole shareholder. Regardless of whether she was a mere figurehead president or an active participant, her ownership interest gave her the potential to earn profits and dividends from the corporation. The fact that she apparently let Douglas

operate the business, which eventually proved unsuccessful, does not change the fact that the funds she put into Spectrum Management were an investment in her business.

■ Had Spectrum Management profited, Winifred would have shared in reaping the benefits of the success. The record indicates that in the Wellses' past business ventures, Winifred shared in or at least benefited from the profits of the ventures. When Winifred and Douglas sold part of their interest in Wells & Son to the Capital Group, the money, which totaled $1 million, was apparently reinvested into Wells & Son. Winifred testified that the family "lived very well" during this time period. The unavoidable inference from her statement is that she was enjoying the prosperity and success of Wells & Son. If Spectrum Management had been a similar success, Winifred surely would have enjoyed the good fortune once again. From our de novo review, we conclude that there is no presumption that the nonmarital funds Winifred infused into Spectrum Management were loans to her husband.

## 2. CONTRACTUAL OBLIGATION OF REPAYMENT

■ Since we have determined that there is no presumption that the money Winifred invested in Spectrum Management was a loan, we next decide if the record shows a contractual agreement that Douglas, as a debtor, would repay Winifred the nonmarital funds advanced to Spectrum Management. Winifred, as the party seeking performance of the alleged oral contract, has the burden of proving its existence by clear, satisfactory, and unequivocal evidence. See, *Herrin v. Johnson Cashway Lumber Co.*, 153 Neb. 693, 46 N.W.2d 111 (1951). See, also, *Sayer v. Bowley*, 243 Neb. 801, 503 N.W.2d 166 (1993); *Yates v. Grosh*, 213 Neb. 164, 328 N.W.2d 200 (1982).

There is evidence in the record that the parties did at one time contemplate and discuss an agreement for repayment out of Douglas' future inheritance. Winifred testified that she insisted on such an agreement from the very beginning and that she reaffirmed this agreement almost every time she advanced money to Douglas. Douglas, on the other hand, denies that he ever agreed to repay Winifred out of his inheritance. However, Douglas admits that the issue of repayment on some terms did

arise on at least a few occasions and that the parties did discuss the terms of the trusts. The question thus becomes whether, from our de novo review, we can say that there is clear, satisfactory, and unequivocal evidence in the record to find the existence of a contract for repayment. We hold that there is not.

First, the record is devoid of any concrete evidence regarding an offer and acceptance necessary to prove the existence of the contract for repayment. "To create a contract, there must be both an offer and an acceptance; there must also be a meeting of the minds or a binding mutual understanding between the parties to the contract." *Lindsay Ins. Agency v. Mead*, 244 Neb. 645, 652, 508 N.W.2d 820, 825 (1993). Accord *Joseph Heiting & Sons v. Jacks Bean Co.*, 236 Neb. 765, 463 N.W.2d 817 (1990). The parties offered conflicting evidence as to whether there was an offer by Winifred to advance the money for Spectrum Management on the condition that Douglas repay her out of his future inheritance and as to whether Douglas accepted such an offer. While the record indicates that the parties discussed repayment, the record lacks any evidence of a "meeting of the minds."

The facts in this case are similar to the situation faced by the court in *Smith v. Smith*, 37 Md. App. 277, 376 A.2d 1164 (1977). In *Smith*, the wife had transferred $2,700 of her separate funds to her husband so that he could move his karate studio closer to where she worked. The karate studio did not prosper in its new location. The wife testified that no express agreement for repayment was made at the time of the transfer, but that there was an understanding that the husband would give her shares or make her an officer in the corporation. The husband testified that he felt a sense of responsibility to give the money back to his wife, but denied that he had ever agreed to repayment.

In denying the wife's claim for repayment, the *Smith* court made the following statement, which we find instructive:

" ' "[T]he wife may become a creditor of the husband, in respect of money or property belonging to her as her separate estate, which the husband has *received under an express promise at the time of repaying to her*. But if such money or other separate property of the wife has been

received by the husband, with the knowledge and acquiescence of the wife, without such express promise at the time, no implied assumpsit, either legal or equitable, will arise to support a claim against the husband or his estate. The wife having the *jus disponendi* of her separate property, if she thinks proper to let her husband have it, or appropriate it, without any express promise or agreement at the time to account for or repay her the amount so received or appropriated, she can not afterwards set up a claim against the husband upon the footing of a creditor. In such case she is taken to have acquiesced in the appropriation of the fund for the common benefit of herself and husband, or for the benefit of the family." . . .' "

(Emphasis in original.) *Smith*, 37 Md. App. at 283-84, 376 A.2d at 1168 (quoting *Nihiser v. Nihiser*, 127 Md. 451, 96 A. 611 (1916)).

The record in the case at bar does not strongly suggest that Winifred and Douglas expressly agreed to enter into a binding contract for repayment when Winifred transferred her nonmarital funds to Spectrum Management. Rather, the evidence is indicative of an investment by Winifred for the mutual benefit of the couple and their family and for the benefit of Spectrum Management.

■ Even if we were to find that an offer and acceptance existed between Winifred and Douglas, the record would still not support enforcement of the contract because the terms of the contract would be entirely subject to conjecture. "It is a fundamental rule that in order to be binding, an agreement must be definite and certain, as to the terms and requirements. It must identify the subject matter and spell out the essential commitments and agreements with respect thereto." *Davco Realty Co. v. Picnic Foods, Inc.*, 198 Neb. 193, 197, 252 N.W.2d 142, 146 (1977). The record before us is packed with nothing but broad generalizations regarding this alleged agreement. The parties' estimates as to the amount of money that Winifred invested in Spectrum Management vary from $350,000 to over $800,000. Neither party could point to a single transaction and say with any certainty that that transaction was

subject to the alleged contract. The bookkeeper, whose records were the only evidence, other than Winifred's testimony, of Winifred's claimed contributions, testified that she had no idea where the money was coming from when she made entries in the ledger. Thus, even if an agreement were found to exist between Winifred and Douglas, enforcement of the agreement would be next to impossible because of the uncertainty surrounding the entire arrangement.

Upon our de novo review, we hold that Winifred did not offer clear, satisfactory, and unequivocal evidence of the existence of a contract for repayment between the parties, and we therefore hold that no such contract existed.

### 3. CONSTRUCTIVE TRUST

Winifred's final argument is that a constructive trust should be imposed on Douglas' future inheritance for the benefit of Winifred, on the grounds that Douglas was unjustly enriched by Winifred's contributions to Spectrum Management. The argument is without merit.

A constructive trust is a relationship, with respect to property, subjecting the person who holds title to the property to an equitable duty to convey it to another on the grounds that his or her acquisition or retention of the property would constitute unjust enrichment. *Brtek v. Cihal*, 245 Neb. 756, 515 N.W.2d 628 (1994).

Generally, a court, sitting in equity, will not impose a constructive trust and constitute an individual as a trustee of the legal title for property unless it be shown, by clear and convincing evidence, that the individual, as a potential constructive trustee, had obtained title to the property by fraud, misrepresentation, or an abuse of an influential or confidential relationship and that, under the circumstances, such individual should not, according to the rules of equity and good conscience, hold and enjoy the property so obtained. *Id.*; *In re Estate of Lienemann*, 222 Neb. 169, 382 N.W.2d 595 (1986).

Winifred's constructive trust argument fails because she has not shown any evidence, let alone clear and convincing evidence, of fraud, misrepresentation, or abuse of a confidential relationship. The only assertion Winifred makes

regarding abuse of a confidential relationship is her allegation that Douglas left the family temporarily when she initially refused to sign as a guarantor on a loan for Spectrum Management. Douglas testified that what Winifred referred to was a planned trip that both Douglas and Winifred knew Douglas was taking.

Likewise, Douglas did not perpetrate fraud or misrepresentation. We have already held that no enforceable agreement for repayment existed between Winifred and Douglas. If Douglas never agreed to reimburse Winifred for her contributions, then he certainly did not perpetrate any fraud against Winifred by accepting the money and investing it in Spectrum Management.

When the evidence in a dissolution case is in conflict, an appellate court may consider, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Baratta v. Baratta*, 245 Neb. 103, 511 N.W.2d 104 (1994). In finding that there were no equitable grounds to support Winifred's claim for relief, the trial judge necessarily believed Douglas' version of what happened over Winifred's. Our de novo review of the record leads us to the same conclusion. Therefore, we find that there was no fraud, misrepresentation, or abuse of a confidential relationship by Douglas.

Since Winifred does not allege any grounds for a finding of unjust enrichment on Douglas' part, we hold that this is not a proper case for imposition of a constructive trust.

## V. CONCLUSION

Winifred has no legal or equitable claim to Douglas' future inheritance. The money that Winifred invested in Spectrum Management was an investment in a corporation of which she was the president and sole stockholder. No enforceable contract for repayment is evident from the record, because there is no clear, satisfactory, and unequivocal evidence of an offer, an acceptance, or any meeting of the minds. Even if there was an offer and acceptance, the agreement is too indefinite to be enforceable. Finally, Winifred cannot claim that Douglas must hold his future inheritance in a constructive trust for Winifred,

because there was no clear and convincing evidence of fraud, misrepresentation, or abuse of a confidential relationship by Douglas.

AFFIRMED.