order changing Montana's placement from Ann's home to a different foster home and that such order is in Montana's best interests. Accordingly, we affirm.

Affirmed.

———————————

Stitch Ranch, LLC, appellee and cross-appellant,
v. Double B.J. Farms, Inc., appellant
and cross-appellee.

___ N.W.2d ___

Filed October 1, 2013.    No. A-12-547.

1.  **Contracts: Parties: Intent.** To create a contract, there must be both an offer and an acceptance; there must also be a meeting of the minds or a binding mutual understanding between the parties to the contract.

2.  ____: ____: ____. A fundamental and indispensable basis of any enforceable agreement is that there be a meeting of the minds of the parties as to the essential terms and conditions of the proposed contract.

3.  ____: ____: ____. A binding mutual understanding or meeting of the minds sufficient to establish a contract requires no precise formality or express utterance from the parties about the details of the proposed agreement; it may be implied from the parties' conduct and the surrounding circumstances.

4.  **Contracts: Parties.** In limited circumstances, the parties' failure to specify an essential term does not prevent the formation of a contract.

5.  ____: ____. The actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon.

6.  ____: ____. Sometimes, a court can ascertain the meaning of a party's promise by referring to the parties' course of dealing with each other, or a general reasonableness standard.

7.  **Breach of Contract: Parties: Intent.** The circumstances must show that the parties manifested an intent to be bound by a contract. Their manifestations are usually too indefinite to form a contract if the essential terms are left open or are so indefinite that a court could not determine whether a breach had occurred or provide a remedy.

8.  **Contracts.** It is a fundamental rule that in order to be binding, an agreement must be definite and certain as to the terms and requirements. It must identify the subject matter and spell out the essential commitments and agreements with respect thereto.

9.  **Contracts: Intent: Words and Phrases.** A mutual mistake is a belief shared by the parties, which is not in accord with the facts.

10. ____: ____: ____. A mutual mistake is one common to both parties in reference to the instrument, with each party laboring under the same misconception about the instrument.

Decisions of the Nebraska Court of Appeals
STITCH RANCH v. DOUBLE B.J. FARMS     329
Cite as 21 Neb. App. 328

11. ____: ____: ____. A mutual mistake exists where there has been a meeting of the minds of the parties and an agreement actually entered into, but the agreement in its written form does not express what was really intended by the parties.

12. **Rescission.** Relief by way of rescission of a contract may be warranted on the basis of a unilateral mistake when the mistake is of so fundamental a nature that it can be said that the minds of the parties never met and that the enforcement of the contract as made would be unconscionable.

13. ____. An instrument may be canceled on the ground of a mistake of fact where the parties entered into a contract evidenced by a writing, but owing to a mistake their minds did not meet as to all essential elements of the transaction.

Appeal from the District Court for Dawson County: James E. Doyle IV, Judge. Affirmed.

Patrick J. Nelson, of Law Office of Patrick J. Nelson, L.L.C., for appellant.

Stephen D. Mossman and Joshua E. Dethlefsen, of Mattson, Ricketts, Davies, Stewart & Calkins, for appellee.

Inbody, Chief Judge, and Irwin and Moore, Judges.

Irwin, Judge.

## I. INTRODUCTION

Stitch Ranch, LLC (Stitch), and Double B.J. Farms, Inc. (DBJ), entered into a contract for the transfer of real property in Dawson County, Nebraska. The contract included a provision requiring Stitch to obtain a "feedlot permit" on the property and to assign the permit to DBJ. A dispute arose between the parties concerning what was required to satisfy the "feedlot permit" provision, and the parties never completed closing. Stitch eventually brought suit, alleging breach of contract and seeking monetary damages, a declaratory judgment, and/ or rescission or cancellation of the contract. The district court ultimately concluded that each party had attached reasonable but materially different meanings to the term "feedlot permit," characterized the issue as one of "mistake," and ordered the contract canceled.

DBJ now appeals, asserting, among other things, that the district court erred in finding that the parties attached different meanings to the term "feedlot permit," in finding that there was a "mistake," and in canceling the contract. We find that

the evidence adduced by the parties demonstrates that there was never any meeting of the minds about the term "feed-lot permit," and we affirm the district court's cancellation of the contract.

## II. BACKGROUND

### 1. Relevant Parties and Individuals

#### (a) Stitch and Triple 7, Inc.

Stitch is a Texas limited liability company. Its members are Ashley C. Maloley, individually, and Ashley C. Maloley, as custodian for Grace E. Maloley. Ashley's husband, Phil Maloley, is not a member of Stitch.

Triple 7, Inc., is a Nebraska corporation. Phil is the president of Triple 7. Ashley holds "one or more offices" in Triple 7.

Phil testified at trial concerning the relationship between Stitch and Triple 7. He testified that Stitch owns property, while Triple 7 owns and runs cattle on Stitch property. He testified that "all the bills go through" Triple 7. Phil testified that he and Ashley jointly make all decisions concerning both Stitch and Triple 7.

#### (b) DBJ

DBJ is a corporation. Brian Johnson is the president of DBJ. Brian and his wife, along with his brother Blake Johnson and Blake's wife, are the shareholders in the corporation. Brian testified that all four of them jointly make decisions for DBJ.

### 2. Real Estate Sale Contract

In October 2010, Stitch and DBJ executed a real estate sale contract concerning real property in Dawson County and Phelps County, Nebraska. Pursuant to the contract, DBJ agreed to pay $1,200,000, including an earnest money deposit of $50,000. DBJ agreed to deliver the balance of the purchase price at closing, upon delivery of a warranty deed and all other documents needed to properly transfer title. The contract provided that closing "shall occur on or about December 15, 2010."

The Dawson County property included farm ground and land that had previously been operated as a feedlot. The real estate sale contract included a provision that "Seller agrees

to obtain a feedlot permit on Dawson County property and to assign permit to Purchaser by January 1, 2011." Testimony adduced at trial indicated that this language concerning a "feedlot permit" was included by Blake and the real estate broker; the real estate broker testified that he and Blake came up with the language "jointly."

### 3. PERMIT TRANSFER FORMS
#### AND CORRESPONDENCE

#### (a) Nebraska's Department of Environmental Quality Forms

The record includes information about the relevant forms from Nebraska's Department of Environmental Quality (hereinafter DEQ) necessary for an entity to obtain and/or transfer a permit relative to operation of a feedlot in Nebraska. The district court received a copy of title 130 of the Nebraska Administrative Code, implementing Nebraska's Livestock Waste Management Act. See Neb. Rev. Stat. § 54-2416 et seq. (Reissue 2010 & Cum. Supp. 2012). See, also, Neb. Rev. Stat. § 81-1501 et seq. (Reissue 2008 & Cum. Supp. 2012). The court noted that title 130 identifies several permits which have application to feedlots, including a "construction and operating permit" and a "National Pollutant Discharge Elimination System" permit (pollution permit).

Applicants for permits are required to complete a form C applicant disclosure (Form C applicant disclosure) document. See, 130 Neb. Admin. Code, ch. 4, § 001.03 (2008); Neb. Admin. Code, ch. 5, § 003.03 (2008). A party possessing a DEQ permit may apply to have that permit transferred to another party by submitting a completed form D transfer request (Form D transfer request) document. See 130 Neb. Admin. Code, ch. 6, § 003.01 (2008).

#### (b) Forms Sent to DBJ From Stitch

Phil testified that after the real estate sale contract was executed, he began taking steps to deal with the "feedlot permit" provision of the contract. Stitch hired an environmental consultant to assist in obtaining and transferring the necessary permit. The evidence adduced at trial indicates that a variety

of proposed transfers, "demands" for completion of transfer forms, and other correspondence were exchanged between the parties.

### (i) Proposed Transfer
### to Daron Huyser

Phil testified that he understood that DBJ intended to immediately resell the Dawson County property to another party, Daron Huyser. Phil testified that he understood that DBJ wanted the permit transferred in Huyser's name.

On December 23, 2010, the real estate broker e-mailed DBJ's counsel and forwarded a Form D transfer request, indicating a proposal to transfer a permit from Triple 7 to Huyser. On the form, the box next to "Construction and Operating Permit" was checked, the current owner or operator was listed as Triple 7, and the name of the proposed owner or operator was listed as "Huyser Cattle Co." Huyser declined to sign any such form.

### (ii) First "Demand" by Stitch

On January 5, 2011, Stitch's counsel sent a letter, a Form C applicant disclosure, and a Form D transfer request to DBJ's counsel. In the letter, Stitch's counsel requested that DBJ sign the forms and return them by January 10. The Form C applicant disclosure listed the name of the animal feeding operation applying for a DEQ permit as DBJ. On the Form D transfer request, the box next to "Construction and Operating Permit" was checked, the current owner or operator was listed as Triple 7, and the name of the proposed owner or operator was listed as DBJ. The form included a line for the date of the "[c]urrent" permit to be transferred, but that line was left blank. The Form D transfer request also included the certification that the applicant (DBJ) had "personally examined and [was] familiar with the permit(s) or construction approval for [the] animal feeding operation." DBJ did not sign and return the forms.

Blake testified that DBJ did not sign the Form D transfer request for a variety of reasons. He testified that the real estate sale contract was with Stitch, not with Triple 7, but that the

Form D transfer request was from Triple 7. He testified that the form also did not indicate any date of a current permit to be transferred, "so [DBJ] had no idea which permit it was or if [Stitch] even had a permit." Finally, the form was not signed by the purported transferor. He also testified that the certification on the form required him to sign and attest he had personally examined and was familiar with the permit, but that Stitch had not provided an actual permit.

On January 7, 2011, DBJ's counsel sent a letter to Stitch's counsel, in which he iterated that the real estate sale contract required Stitch to obtain and transfer a "feedlot permit," that there had been no indication Stitch had ever obtained a feedlot permit, and that the Form D transfer request sent by Stitch's counsel showed the transferor to be Triple 7. DBJ's counsel asked for clarification.

### (iii) Second "Demand" by Stitch

On January 13, 2011, Stitch's counsel sent another letter, a copy of a DEQ 2010 annual permit fee invoice, a Form C applicant disclosure, and a Form D transfer request to DBJ's counsel. In the letter, Stitch's counsel represented that the Dawson County property "currently [held] a permit . . . in the name of R & J Cattle, Inc.," and represented that "[t]his 'feedlot permit' [would] be transferred" to DBJ "through a series of two transfers," with the first being a transfer from "R & J Cattle, Inc." (hereinafter R&J Cattle), to Triple 7 and the second being a transfer from Triple 7 to DBJ. Stitch's counsel indicated that "[t]he transfer requests [could] be filed . . . contemporaneously."

Stitch's counsel indicated that he was including copies of the forms necessary to transfer the DEQ permit held by R&J Cattle to Triple 7. He indicated that transfer of the permit from Triple 7 to DBJ would be accomplished through DBJ's executing the forms attached to the January 5, 2011, correspondence.

The annual permit fee invoice indicated that on February 1, 2010, R&J Cattle had owed DEQ for an annual permit fee. The invoice specifically referenced a "National Pollutant Discharge Elimination System (NPDES) permit" (i.e., a

"pollution permit"). It did not reflect payment and did not indicate the status of any permit as of January 2011. The Form C applicant disclosure listed the name of the animal feeding operation applying for a DEQ permit as Triple 7. On the Form D transfer request, the box next to "Construction and Operating Permit" was checked, the current owner or operator was listed as "Ryan and Jeff Cattle Co.," and the name of the proposed owner or operator was listed as Triple 7. The form included a line for the date of the "[c]urrent" permit to be transferred, but that line was left blank.

On January 20, 2011, DBJ's counsel sent a letter to Stitch's counsel, in which letter DBJ's counsel indicated that he had learned that "there is apparently no feedlot permit presently in place" for the Dawson County property. DBJ's counsel asked Stitch's counsel what he knew "about that issue."

### (iv) Third "Demand" by Stitch

On January 27, 2011, Stitch's counsel sent another letter to DBJ's counsel. In the letter, Stitch's counsel indicated that the person who had informed DBJ's counsel that there was no permit in place on the property "does not have the authority to speak on behalf of Stitch . . . , particularly as it relates to complex issues involving" DEQ. Stitch's counsel did not otherwise respond to the assertion that there was then no existing permit on the property. Stitch's counsel also, again, indicated that to close, DBJ needed to execute the previously proffered Form C applicant disclosure and Form D transfer request.

Stitch's counsel also noted that the parties were then "nearly a month and a half past" the date of closing specified in the contract, and asserted that "[a]s a general matter, time is of the essence in all real estate dealings." Stitch's counsel then set "a deadline of Tuesday, January 31, 2011 at 3:00 p.m. for receipt of the executed" forms. Stitch's counsel concluded the letter by indicating that "[i]f the forms are not received by that time, Stitch . . . will have no choice but to conclude that [DBJ] has declined to consummate the purchase with the attendant remedies available to Stitch . . . under the Contract."

On January 31, 2011, DBJ's counsel responded with a letter. DBJ's counsel took issue with Stitch's counsel's assertions

that the contract called for closing on a specific date, pointing out the contract indicated closing was to be "'on or about'" a particular date, and that time is generally of the essence, citing authority in Nebraska indicating that time is generally not of the essence unless so provided in the instrument. DBJ's counsel iterated DBJ's assertion that Stitch had not, as of that time, obtained "any feedlot permit whatsoever" and had not assigned "any feedlot permit whatsoever."

DBJ's counsel asked Stitch to identify "[w]hat feedlot permit or permits [it] claim[ed] or contend[ed] [were then] in force and effect in connection with the Dawson County land," and requested a "full, complete and genuine copy of each one." DBJ's counsel then noted that the documents previously forwarded by Stitch included references to a "'Construction and Operating'" permit (i.e., the various Form C applicant disclosure and Form D transfer request forms attached to the January 5 and 13, 2011, letters) and a pollution permit (i.e., the annual permit fee invoice attached to the January 13 letter).

DBJ's counsel again represented that it had received information, this time from DEQ, indicating that there was then "no feedlot permit in effect." DBJ's counsel indicated that "'Ryan and Jeff Rogers Cattle Co.'" had previously been issued a pollution permit in 1993, but that it had expired in 1998 and was not a permit that was transferable at all. DBJ's counsel indicated that the only construction and operating permit ever issued in connection with the property had been issued in 1973, in the name of "'Sarnes & Son.'"

### (v) Fourth "Demand" by Stitch

On February 3, 2011, Stitch's counsel responded with another letter to DBJ's counsel. Stitch's counsel indicated that "[w]e all agree what the Contract states in relevant part. The Feedlot Permit cannot be transferred without [DBJ's] signature" on the forms previously forwarded. Stitch's counsel specifically represented that the contract did not obligate Stitch to transfer any pollution permit, "only a 'Feedlot Permit.'"

On February 4, 2011, DBJ's counsel responded with another letter to Stitch's counsel. DBJ's counsel indicated that DBJ had scheduled closing for February 9 at the closing agent's office.

DBJ's counsel again asked Stitch to forward "a copy of whatever document(s) it is/are that constitute(s) the 'feedlot permit' [Stitch] was contractually obligated 'to obtain,'" as well as "a copy of whatever document(s) it is/are that constitute(s), when completed by [Stitch], the assignment of such feedlot permit to [DBJ]."

### (vi) Fifth "Demand" by Stitch

On February 8, 2011, DBJ's counsel sent another letter, enclosing a variety of documents related to the closing scheduled for the next day, and again requesting copies of the "'feedlot permit'" that Stitch was purporting to possess and transfer.

The same day, Stitch's counsel responded with another letter in anticipation of the closing scheduled for the next day. Stitch's counsel included another copy of the Form C applicant disclosure and Form D transfer request that had been previously forwarded for DBJ's completion. Stitch's counsel iterated, again, that the forms "are all that is required to transfer the 'Feedlot Permit' to [DBJ]." Stitch's counsel represented that "[s]imilar forms [had] already been filed with [DEQ] to transfer the 'Feedlot Permit' to Triple 7 . . . ." Stitch's counsel also included a draft of a release, which he indicated Stitch would require to close and which indicated that the forms previously provided by Stitch fulfilled Stitch's contractual responsibilities.

On February 9, 2011, DBJ provided the closing agent with a check slightly in excess of $1,150,000, as well as other documents necessary to close on the purchase. DBJ also provided the closing agent with instructions that DBJ did not authorize closing unless Stitch tendered a "presently effective feedlot permit in the name of Stitch" and a "written assignment of the above-described feedlot permit from [Stitch] to [DBJ]." DBJ represented to the closing agent that, to its knowledge, Stitch "ha[d] not obtained a feedlot permit" related to the Dawson County property.

Ashley testified that at the February 9, 2011, closing, Stitch presented to DBJ the same Form C applicant disclosure and Form D transfer request documents previously sent to DBJ and requested, again, that DBJ sign the forms. She testified that

DBJ, again, did not sign the forms. The closing did not occur on February 9.

### (vii) Sixth "Demand" by Stitch

On February 10, 2011, DBJ's counsel sent a letter to Stitch's counsel. In the letter, DBJ's counsel indicated that DBJ felt that it was "in a position to seek relief in a specific performance lawsuit." DBJ's counsel proposed negotiations "in an effort to resolve the matter."

On February 17, 2011, Stitch's counsel responded with a letter to DBJ's counsel. Stitch's counsel attached copies of documents showing that DEQ had authorized transfer of a "'Feedlot Permit'" to Triple 7, including a letter from DEQ and a copy of a construction and operating permit issued to Triple 7. Stitch's counsel again requested, "for the final time," that DBJ complete the Form C applicant disclosure and Form D transfer request documents previously forwarded to DBJ. Stitch's counsel represented that DBJ's failure to sign the forms in response would entitle Stitch to retain the $50,000 earnest money deposit and would constitute an abandonment by DBJ of any claims to the property.

The letter from DEQ attached to Stitch's counsel's letter indicated that DEQ had received from Stitch a Form D transfer request "requesting a transfer of the [pollution] permit previously issued to" R&J Cattle. DEQ advised, however, that the pollution permit had expired and was not able to be transferred, and advised that DEQ could transfer an operating permit "previously issued to Sarnes & Son on November 6, 1973."

This information from DEQ was consistent with representations DBJ made to Stitch in the January 31, 2011, letter responding to Stitch's third "demand" for DBJ to sign the forms. In addition, it is apparent from the record that the construction and operating permit issued to Triple 7 and referenced in the DEQ letter, dated February 15, 2011, was the first permit actually issued to Stitch or Triple 7.

On February 18, 2011, DBJ's counsel responded to Stitch's counsel's letter. DBJ's counsel indicated that DBJ did not "agree with [Stitch's] threatened assumption nor the legal claims and conclusions contained in [Stitch's counsel's] letter."

DBJ's counsel indicated that he would meet with DBJ and be in touch with Stitch's counsel.

On February 21, 2011, DBJ's counsel sent another letter to Stitch's counsel. DBJ's counsel indicated that "the feedlot permit which is required, by the contract's terms, to be assigned to [DBJ] includes [a pollution] permit." DBJ's counsel indicated that Stitch "has pretty much conceded the point in [Stitch's counsel's] letters (and relevant enclosures, if any) . . . of January 13, 2011, February 3, 2011, and February 8, 2011, and in [Phil's] engineer's letter . . . and enclosures, sent to the [DEQ]." DBJ's counsel then proposed settlement terms.

### 4. Litigation

On February 22, 2011, Stitch's counsel sent an e-mail to DBJ's counsel. In the e-mail, Stitch's counsel represented that DBJ's offer to settle was rejected and inquired whether DBJ would file a voluntary appearance to the complaint Stitch intended to file. A complaint was filed in the district court for Dawson County the same day.

On February 23, 2011, DBJ's counsel responded with an e-mail. In that e-mail, DBJ's counsel represented that DBJ "ha[d] decided to proceed with closing at the $1.2 million figure, based on the present feedlot permit status." As noted, however, by this time, the complaint had already been filed.

### (a) Complaint

In its complaint, Stitch alleged that Stitch and DBJ had entered into a real estate sale contract. Stitch alleged that the contract included a provision requiring Stitch to obtain and transfer a "feedlot permit" and that the contract specifically contemplated that the "feedlot permit" would be transferred after closing.

Stitch then alleged that the property "currently [held] a 'Feedlot Permit'" from DEQ and that attached and incorporated was the 2010 annual permit fee invoice related to" R&J Cattle. Stitch then alleged that "[t]his 'Feedlot Permit' was to be transferred to [DBJ] through a series of two transfers" and alleged that the first transfer was to be to Triple 7 and the second was to be from Triple 7 to DBJ. Stitch alleged that

the required Form C applicant disclosure and Form D transfer request documents had been forwarded to DBJ on January 5 and 13, 2011, and that several demands had been made by Stitch to DBJ for completion of the forms.

Stitch alleged that it "stood ready, willing and able to close the sale but could not do so until [DBJ] signed the [f]orms" and that DBJ "declined to consummate the purchase."

Stitch alleged that on February 15, 2011, DEQ "granted the transfer of the 'Feedlot Permit' to Triple 7" and that on February 17, Stitch made another demand on DBJ to sign and return the forms needed to transfer the permit from Triple 7 to DBJ.

Stitch alleged that DBJ breached the contract and that Stitch was entitled to liquidated and general monetary damages. Stitch also sought a declaratory judgment that it had complied with the "feedlot permit" provision in the contract and that DBJ had failed to consummate the purchase, entitling Stitch to retain the earnest money deposit. Finally, Stitch sought, in the alternative, an order rescinding and canceling the contract due to the "mutual mistake of the parties" by using the term "feedlot permit" in the contract.

### (b) Answer

In its answer, DBJ essentially denied the vast majority of Stitch's assertions. For example, Stitch alleged in its complaint the following: "11. Under Miscellaneous Provisions, the Contract states: Seller agrees to obtain a feedlot permit on Dawson County property and to assign permit to Purchaser by January 1, 2011." A review of the second page of the contract indicates that the asserted language appears, word for word, under the heading "Miscellaneous Provisions," in the real estate sale contract. Nonetheless, in its answer, DBJ responded to this assertion as follows: "11. Denies, except that [DBJ] admits that the Sale Contract speaks for itself as to its terms." DBJ made similar "denials," with the limitation that the contract "speaks for itself" with respect to other assertions by Stitch that the contract included specific language which a review of the contract reveals it did, in fact, include exactly as represented by Stitch.

DBJ specifically denied that Stitch had complied with the "feedlot permit" provision of the contract. DBJ also specifically denied that the parties had made a mutual mistake by using the term "feedlot permit" in the contract.

DBJ also asserted a counterclaim, requesting the district court to "enter a decree of specific performance, requiring [Stitch] to specifically perform its obligations under the Sale Contract." DBJ also requested an accounting of rents and profits from the properties from and after February 9, 2011.

### (c) Trial

The primary issue litigated in this case was the meaning of the "feedlot permit" provision in the real estate sale contract. To litigate that issue, the parties adduced more than 450 pages of testimony and presented nearly 280 exhibits, some of which comprised three-ring binders containing as many as 80 different documents. Trial was held over the course of 2 days.

At trial, Stitch argued that the term "feedlot permit" in the contract meant an operating permit, not both an operating permit and a pollution permit. Stitch argued that the only way to transfer a permit to DBJ was for DBJ to sign the tendered Form C applicant disclosure and Form D transfer request documents, that Stitch presented those documents and requested DBJ's signature on multiple occasions, and that DBJ had refused to consummate the contract. Stitch also argued that accomplishing the transfer by use of Triple 7, instead of Stitch itself, was not a problem.

At trial, DBJ argued that Stitch never obtained or transferred any feedlot permit to DBJ. DBJ argued that the Form C applicant disclosure and Form D transfer request documents presented to it from Stitch were ineffective for a variety of reasons, including that they did not include dates of any permits proposed to be transferred. DBJ argued that it had asked Stitch on multiple occasions to identify what permit was being proposed to be transferred to DBJ, but that Stitch repeatedly failed to do so. DBJ argued that Stitch had represented on some occasions it intended to transfer a permit previously held by R&J Cattle, but that R&J Cattle only ever possessed

a pollution permit and that Triple 7 never obtained a pollution permit and obtained only an operating permit.

Stitch adduced testimony, inter alia, from Phil and Ashley, Brian and Blake, and the real estate broker. DBJ adduced testimony from Phil and Ashley and from Brian and Blake. That testimony, and the documentary evidence proffered by the parties, establishes the timeline of correspondence detailed above.

Phil testified that prior to Stitch's ever purchasing the Dawson County property, he performed "due diligence" and learned that there was an operating permit in the name of "Sarnes & Son." He testified that the paperwork needed to transfer the permit from Sarnes & Son to R&J Cattle had never been completed. Phil testified that he never provided Stitch's counsel with a copy of the Sarnes & Son permit to be provided to DBJ. He acknowledged having seen letters from DBJ's counsel to Stitch's counsel requesting to see copies of the "feedlot permit" that Stitch was proposing would be transferred by completion of the Form C applicant disclosure and Form D transfer request documents, and acknowledged that after seeing the requests from DBJ, he did not forward a copy of the Sarnes & Son permit to Stitch's counsel.

Brian testified that he and Blake were also directors in another corporation. He testified that in 2005, that corporation went through the process with DEQ to obtain both a construction and operating permit and coverage under a pollution permit, in association with operating a feedlot. He testified that he spoke with Blake about the language in the "feedlot permit" provision in the real estate sale contract at issue in this case, but that he did not specify whether Stitch was to obtain a construction and operating permit, a pollution permit, or both.

Blake testified that DBJ declined to sign the Form C applicant disclosure and Form D transfer request documents proffered by Stitch for a variety of reasons, including that the forms did not specify what permit Stitch was purporting would be transferred. He testified that DBJ was not contending that the term "feedlot permit" in the real estate sale contract actually meant "feedlot permits, plural."

Also introduced in evidence was the deposition of the environmental consultant hired by Stitch to assist in obtaining and transferring the required "feedlot permit." In his deposition, the consultant testified that he informed Stitch's counsel in November 2010 that he could not find a "'current'" pollution permit for the property. He testified that the pollution permit had, at that time, expired. He testified that he forwarded Form C applicant disclosure and Form D transfer request documents to Stitch's counsel to request the transfer of the previous pollution permit from R&J Cattle to Triple 7.

The environmental consultant also testified that he, on behalf of Stitch and Triple 7, forwarded documents to DEQ for Triple 7 to obtain a feedlot permit. He testified that on the documents he forwarded, he had "checked" the boxes next to both "Construction and Operating Permit" and "[pollution] permit." He testified that DEQ eventually issued Triple 7 an operating permit.

Also introduced in evidence was the deposition of a supervisor from DEQ. The supervisor was asked if he would consider Stitch's counsel to be "more or less of an expert in the cattle feedlot area of the law," and he indicated that he would so consider Stitch's counsel. The supervisor testified about the history of permits on the property, including that Sarnes & Son had been issued an operating permit in 1973, that R&J Cattle had been issued a pollution permit in 1993, and that R&J Cattle's pollution permit expired in 1998 and was never transferable to any other entity. He confirmed that Stitch never held any DEQ permit concerning the property.

The DEQ supervisor was specifically asked about whether the paperwork could have been submitted simultaneously for Triple 7 to obtain a permit and to transfer it to DBJ. He acknowledged that for DEQ's "permitting process," a party has to have a permit to be able to transfer that permit to another party. When asked if the paperwork could have been submitted simultaneously, he first answered, "My assessment would say no because . . . there wouldn't be a permit to transfer yet." He acknowledged, however, that the paperwork could be reviewed "with the thought of a transfer [that] couldn't be

simultaneous but with a transfer after the transfer [was] made to Triple 7."

### (d) District Court's Judgment

The district court found that "the evidence clearly and convincingly prove[d] the parties attached different meanings to the term 'feedlot permit' as used in the [real estate sale] contract." The court found that Stitch "held the belief that its obligation under the contract was to transfer a construction and operating permit," while DBJ "held the belief that [Stitch] was required to obtain and 'assign' to it a 'feedlot permit' which included a [pollution] permit." The court held that the "beliefs on the part of the parties as to the meaning and effect attached to the wording in the contract constituted a mistake, i.e., each party held a reasonable, but materially different understanding of the meaning" of the term "feedlot permit."

The court held that it was "not possible to resolve the differences in meaning in a manner clearly fair to both parties." The court held that it could not "determine the intent of the parties under the contract to know whether the reference to 'feedlot permit' referred to just one or all of the permits required [to operate] a feedlot." The court held that "[i]t is uncertain and unclear whether the parties intended that only one or all necessary permits were required."

The court also held that "[t]he mistake" was "so substantial and fundamental that it defeats the object of the parties in making the agreement." The court held that the parties "attached substantially different meanings to a fundamental term in the contract which could not be reconciled and such difference in meanings defeats the object of the contract."

The court concluded that it could not find that either party had breached the contract, because each had attached a different meaning to the term "feedlot permit." Similarly, the court concluded that it could not "issue a declaratory ruling to declare the rights and obligations of the parties under the contract," because each party's rights and obligations were "subject to reasonable, but materially and substantially different, interpretations." Finally, the court concluded that it could not

order specific performance of the contract, again because of the reasonable but substantially different meanings each party attached to the term "feedlot permit."

The court ultimately held that the contract between the parties "should be cancelled on the grounds of mistake." The court further held that the "mistake" was fundamental in nature, making the contract voidable, and ordered the contract voided and canceled, and the parties restored as nearly as possible to the positions they held before entering the contract.

The district court entered a decree of cancellation and rescission. The court ordered the contract "cancelled, annulled, and rendered *void ab initio*." The court also ordered the return of the earnest money deposit to DBJ. This appeal followed.

### III. ASSIGNMENTS OF ERROR

On appeal, DBJ has assigned several errors, including that the district court erred in finding that the parties attached different meanings to the term "feedlot permit," in finding that there was a "mistake" by the parties in using the term "feedlot permit," and in canceling the real estate sale contract between the parties.

Stitch has asserted a cross-appeal, asserted only in the event this court finds merit to DBJ's direct appeal, assigning as error the district court's failure to find that DBJ breached the contract.

### IV. ANALYSIS

#### 1. DBJ's Direct Appeal

DBJ has assigned several errors challenging the district court's conclusion that the contract should be canceled. DBJ challenges the court's finding that the parties attached different meanings to the term "feedlot permit" and that there was a "mistake" by the parties in using that term. We find that the evidence adduced at trial demonstrates there was never a meeting of the minds between the parties concerning the meaning of the term "feedlot permit" and that the court did not err in canceling the contract.

[1-3] The basic principles of law governing this case have long been established. To create a contract, there must be both

an offer and an acceptance; there must also be a meeting of the minds or a binding mutual understanding between the parties to the contract. *City of Scottsbluff v. Waste Connections of Neb.*, 282 Neb. 848, 809 N.W.2d 725 (2011). A fundamental and indispensable basis of any enforceable agreement is that there be a meeting of the minds of the parties as to the essential terms and conditions of the proposed contract. *Peters v. Halligan*, 182 Neb. 51, 152 N.W.2d 103 (1967). A binding mutual understanding or meeting of the minds sufficient to establish a contract requires no precise formality or express utterance from the parties about the details of the proposed agreement; it may be implied from the parties' conduct and the surrounding circumstances. *City of Scottsbluff v. Waste Connections of Neb., supra.*

[4-7] In limited circumstances, the parties' failure to specify an essential term does not prevent the formation of a contract. *Id.* "The Restatement (Second) of Contracts provides that 'the actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon.'" *City of Scottsbluff v. Waste Connections of Neb.*, 282 Neb. at 861, 809 N.W.2d at 740. Sometimes, a court can also ascertain the meaning of a party's promise by referring to the parties' course of dealing with each other, or a general reasonableness standard. *City of Scottsbluff v. Waste Connections of Neb., supra.* The circumstances must still show that the parties manifested an intent to be bound by a contract. Their manifestations are usually too indefinite to form a contract if the essential terms are left open or are so indefinite that a court could not determine whether a breach had occurred or provide a remedy. *Id.*

[8] It is a fundamental rule that in order to be binding, an agreement must be definite and certain as to the terms and requirements. It must identify the subject matter and spell out the essential commitments and agreements with respect thereto. *MBH, Inc. v. John Otte Oil & Propane*, 15 Neb. App. 341, 727 N.W.2d 238 (2007); *Wells v. Wells*, 3 Neb. App. 117, 523 N.W.2d 711 (1994).

(a) Evidence of Stitch's
Interpretation of Term

It appears that throughout the course of these proceedings, Stitch's interpretation of the term "feedlot permit" was inconsistent. The evidence adduced at trial demonstrates that Stitch sometimes operated as if the term meant an "operating permit," sometimes operated as if the term meant a "pollution permit," and sometimes operated as if the term meant both permits.

Phil testified that prior to Stitch's ever purchasing the Dawson County property at issue in this case, he performed "due diligence" and learned that there was an "operating permit" in the name of Sarnes & Son. He testified that the paperwork had never been completed to transfer that permit to R&J Cattle, although other evidence indicates that R&J Cattle did, at one time, possess a "pollution permit" related to the property.

The first correspondence from Stitch's counsel to DBJ's counsel concerning transfer of a permit was a January 5, 2011, letter. In that letter, Stitch's counsel included partially completed Form C applicant disclosure and Form D transfer request documents. On those documents, Stitch had checked a box indicating that the permit to be transferred was a "Construction and Operating Permit." The form did not, however, include any date information to identify a then-existing permit.

On January 13, 2011, Stitch's counsel sent another correspondence to DBJ's counsel concerning transfer of a permit. In that letter, Stitch's counsel referenced the prior forms—which referred to a "Construction and Operating Permit"—but also referenced a plan to transfer a permit held by R&J Cattle to Triple 7 and then to DBJ. Stitch's counsel included documents to demonstrate the paperwork necessary to transfer R&J Cattle's permit to Triple 7, and also included a copy of an invoice for the permit allegedly held by R&J Cattle. That invoice, and other evidence adduced at trial, indicated that R&J Cattle had at one time possessed a "pollution permit." There was evidence adduced that R&J Cattle never possessed an operating permit, only ever possessed a pollution permit, and did not possess a permit that could actually be transferred

to anyone. The paperwork sent by Stitch's counsel on this date again did not include any date information to identify a then-existing permit.

On January 20, 2011, DBJ's counsel expressed concern to Stitch's counsel that there was no then-existing feedlot permit on the property.

On January 27, 2011, Stitch's counsel again represented that DBJ needed to complete the forms first forwarded to DBJ's counsel on January 5, which referenced a "Construction and Operating Permit" and not a "pollution permit." Stitch's counsel again did not provide any date information or other information to identify any then-existing permit that Stitch was intending to transfer.

On January 31, 2011, DBJ's counsel specifically represented to Stitch's counsel that his prior correspondence had varyingly referenced a "Construction and Operating Permit" and a "pollution permit," and again requested Stitch to identify precisely what permit it was intending to transfer. DBJ's counsel also specifically represented to Stitch's counsel that R&J Cattle did not possess a then-existing permit, having previously possessed a "pollution permit," which had expired, and that the only "operating permit" had been issued in 1973 in the name of Sarnes & Son.

On February 3, 2011, Stitch's counsel again represented that DBJ needed to complete the forms previously forwarded to DBJ's counsel—which referenced only a "Construction and Operating Permit." Stitch's counsel specifically represented that Stitch was not required to transfer a "pollution permit." Stitch's counsel again did not provide any date information or other information to identify a then-existing permit on the property that it intended to transfer.

On February 8, 2011, Stitch's counsel again represented that DBJ needed to complete the forms previously forwarded to DBJ's counsel—which referenced only a "Construction and Operating Permit." Stitch's counsel also indicated that Stitch would require DBJ to execute a release providing that the forms provided by Stitch—referencing only a "Construction and Operating Permit"—fulfilled Stitch's contractual obligation.

Evidence adduced at trial demonstrated that the environmental consultant, on behalf of Stitch, eventually forwarded documents to DEQ for Triple 7 to obtain a feedlot permit. The documents he forwarded to DEQ indicated that Triple 7 was seeking both a "Construction and Operating Permit" and a "pollution permit."

On February 17, 2011, Stitch's counsel forwarded documents showing that DEQ had then issued a construction and operating permit to Triple 7. Stitch's counsel again represented that DBJ needed to complete the forms previously forwarded to DBJ's counsel. The paperwork related to Triple 7's permit, however, demonstrated that Stitch had requested DEQ transfer the "pollution permit" previously possessed by R&J Cattle, but that DEQ informed Stitch that the permit had expired and that the only existing permit which could be transferred was the 1973 operating permit issued to Sarnes & Son.

On February 22, 2011, Stitch filed a complaint in the district court. In that complaint, Stitch again referenced the permit that had previously been held by R&J Cattle—which the evidence demonstrates was only a "pollution permit"—and specifically alleged that "[t]his 'Feedlot Permit' was to be transferred" to DBJ. Stitch also alleged that it was ready, willing, and able to transfer the permit DEQ had issued to Triple 7—a "construction and operating permit"—to DBJ.

At trial, Stitch argued that the term "feedlot permit" in the real estate sale contract meant an "operating permit," and not both an "operating permit" and a "pollution permit." In addition, despite the evidence that Stitch was inconsistent about its representations and interpretations of the term, evidence was adduced indicating that a supervisor from DEQ considered Stitch's counsel to be an expert in this area of law.

Thus, the evidence adduced in this case demonstrates that Stitch has acted inconsistently with the term "feedlot permit," meaning at various times a "construction and operating permit," a "pollution permit," and both a "construction and operating permit" and a "pollution permit." Despite Phil's knowledge before purchasing the property that the "operating permit" was in the name of Sarnes & Son and despite Stitch's

counsel's being informed during the course of correspondence that R&J Cattle possessed only an expired "pollution permit," Stitch acted to transfer the R&J Cattle permit, applied for both a "construction and operating permit" and a "pollution permit," made assertions in its complaint suggesting that it believed it was obligated to transfer the R&J Cattle "pollution permit," and argued at trial that it was never obligated to transfer a "pollution permit." This evidence demonstrates that Stitch was not consistent in its own representations about what it believed the term "feedlot permit" was intended to mean.

### (b) Evidence of DBJ's
### Interpretation of Term

Similarly, it appears that throughout the course of these proceedings, DBJ's interpretation of the term "feedlot permit" was inconsistent. The evidence adduced at trial demonstrates that DBJ often made no representation about what it believed the term meant but, at other times, made representations suggesting it believed that the term meant both an "operating permit" and a "pollution permit," and at still other times, that the term meant only an "operating permit."

Brian testified that he and Blake—principals in DBJ—were also directors in another corporation, and that in 2005, they went through the process with DEQ to obtain both a "construction and operating permit" and a "pollution permit" concerning an unrelated parcel of property. Blake, along with the real estate broker, was the one who included the language "feedlot permit" in the provision at issue, and Brian testified that he and Blake spoke about the language but did not specify whether it was intended to mean a "construction and operating permit," a "pollution permit," or both.

Throughout most of the correspondence between the parties, DBJ did not object to completing the forms forwarded by Stitch on the basis that they appeared to refer only to an "operating permit" and not also a "pollution permit." Rather, DBJ's counsel repeatedly inquired of Stitch what permit it was intending to transfer, but did not explicitly represent that a "pollution permit" or both permits were required.

It was not until February 21, 2011, that DBJ first explicitly represented to Stitch that the term "feedlot permit" in the real estate sale contract included a "pollution permit." DBJ proposed settlement to Stitch even without a "pollution permit" if Stitch would reduce the purchase price. Then, once Stitch filed a complaint, DBJ represented that it would proceed with closing based on the then-existing permit status—with Triple 7's possessing and proposing to transfer only a "construction and operating permit."

At trial, Brian testified that DBJ did not contend that the term "feedlot permit" in the real estate sale contract required more than one permit.

Thus, although DBJ's representations and actions throughout have arguably been less inconsistent, the evidence adduced demonstrates that DBJ did not specifically indicate to Stitch whether DBJ required only a "pollution permit," only a "construction and operating permit," or both permits. DBJ variously indicated that a "pollution permit" was required, but also offered to accept only the "construction and operating permit," and Brian testified that DBJ did not allege that more than one permit was required.

### (c) Application and Resolution

In the present case, there was substantial evidence adduced at trial concerning the "feedlot permit" provision in the real estate sale contract, including the correspondence and testimony outlined above in the background section of this opinion. Although there were other ancillary issues between the parties related to performance and closing on the real estate sale contract, the "feedlot permit" provision was the primary issue between the parties that resulted in the fact that the contract was never closed and litigation was pursued.

Among other assertions, Stitch alleged in its complaint that the use of the term "feedlot permit" was a mutual mistake by the parties. The district court ultimately concluded that each party attached materially different meanings to the term and that such constituted a "mistake" sufficient to justify cancellation of the contract.

[9-11] A mutual mistake is a belief shared by the parties, which is not in accord with the facts. *R & B Farms v. Cedar Valley Acres*, 281 Neb. 706, 798 N.W.2d 121 (2011). A mutual mistake is one common to both parties in reference to the instrument, with each party laboring under the same misconception about the instrument. See *id*. A mutual mistake exists where there has been a meeting of the minds of the parties and an agreement actually entered into, but the agreement in its written form does not express what was really intended by the parties. *Id*.

The record in the present case does not demonstrate a mutual mistake, because it is clear that there was no shared belief or common misunderstanding about the term "feedlot permit," as used in the real estate sale contract. Indeed, the record demonstrates quite the opposite and indicates that there was no common understanding or shared belief about what the term was intended to mean.

In this case, the evidence adduced at trial demonstrates that there was never any meeting of the minds concerning the term "feedlot permit" and what DEQ permit or permits had to be obtained and transferred by Stitch to satisfy the contract. The term was not defined in the contract, and the evidence indicates that each party's actions and representations throughout the proceedings suggested changing interpretations of the term; there is no evidence that the parties ever actually discussed exactly what was intended by the term.

The parties' conduct and surrounding circumstances in this case demonstrate that it is impossible to determine whether the term "feedlot permit" was intended to require an "operating permit" or a "pollution permit" or both permits. Stitch's continued references to the R&J Cattle permit (which was only ever a "pollution permit") while simultaneously arguing that only an "operating permit" was ever required, even through the course of this appeal, demonstrate that Stitch never had an understanding of what permit was required. DBJ's varying representations about needing a "pollution permit," DBJ's being willing to accept only an "operating permit," and testimony that the term was not intended to require multiple permits, similarly

demonstrate a lack of clarity concerning DBJ's belief and understanding. The term "feedlot permit" is so indefinite that the court could not determine whether a breach had occurred or provide a remedy. See *City of Scottsbluff v. Waste Connections of Neb.*, 282 Neb. 848, 809 N.W.2d 725 (2011).

[12,13] In *Turbines Ltd. v. Transupport, Inc.*, 19 Neb. App. 485, 808 N.W.2d 643 (2012), this court recognized that relief by way of rescission of a contract could be warranted on the basis of a unilateral mistake when the mistake is of so fundamental a nature that it can be said that the minds of the parties never met and that the enforcement of the contract as made would be unconscionable. See, also, *Turbines Ltd. v. Transupport, Inc.*, 285 Neb. 129, 825 N.W.2d 767 (2013). Similarly, in *In re Estate of Potthoff*, 6 Neb. App. 418, 573 N.W.2d 793 (1998), we recognized that an instrument may be canceled on the ground of a mistake of fact and noted that where the parties have apparently entered into a contract evidenced by a writing, but owing to a mistake their minds did not meet as to all essential elements of the transaction, a court of equitable jurisdiction could interpose to rescind and cancel the apparent contract and to restore the parties to their former positions.

In the present case, the district court concluded that the parties did not attach the same meaning to the term "feedlot permit" in their real estate sale contract. As demonstrated by the evidence discussed above, we agree with this conclusion—in fact, the evidence suggests that each individual party did not consistently attach the same meaning to the term, let alone attach the same meaning as the other party. As a result, their minds did not meet as to this term, which nobody has asserted was a nonessential term. We therefore affirm the court's cancellation of the contract and restoration of the parties to their former positions.

## 2. STITCH'S CROSS-APPEAL

Stitch asserted error in the district court's judgment by way of a cross-appeal. Stitch asserted, however, that the cross-appeal was being brought "[o]nly in the alternative" and only if this court found error in the district court's cancellation of the

contract. Brief for appellee on cross-appeal at 29. Inasmuch as we have affirmed the court's cancellation of the contract, we need not further address Stitch's cross-appeal.

## V. CONCLUSION

We find that the evidence adduced at trial demonstrates that there was never a meeting of the parties' minds concerning the meaning of the term "feedlot permit" in the real estate sale contract. We affirm the district court's cancellation of the contract.

AFFIRMED.

———————————

IN RE ROLF H. BRENNEMANN TESTAMENTARY TRUST.
KIM ABBOTT, BENEFICIARY, APPELLANT, V.
JOHN E. BRENNEMANN ET AL.,
TRUSTEES, APPELLEES.

___ N.W.2d ___

Filed October 1, 2013.    No. A-12-1029.

1. **Trusts: Equity: Appeal and Error.** Absent an equity question, an appellate court reviews trust administration matters for error appearing on the record; but where an equity question is presented, appellate review of that issue is de novo on the record.
2. **Attorney Fees: Appeal and Error.** On appeal, a trial court's decision awarding or denying attorney fees will be upheld absent an abuse of discretion.
3. ____: ____. When an attorney fee is authorized, the amount of the fee is addressed to the discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of an abuse of discretion.

Appeal from the County Court for Grant County: JAMES J. ORR, Judge. Affirmed.

David A. Domina and Jeremy R. Wells, of Domina Law Group, P.C., L.L.O., for appellant.

Neil E. Williams and Nathaniel J. Mustion, of Lane & Williams, P.C., L.L.O., for appellees.

INBODY, Chief Judge, and MOORE, Judge.